IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LOLITA C., ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 17-cv-02949 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| KILOLO KIJAKAZI, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This is a Social Security disability appeal from an adverse decision by an Administrative Law Judge ("ALJ"). *See* 42 U.S.C. § 405(g). Plaintiff Lolita C. suffers from impairments including rheumatoid arthritis, hyperthyroidism, and depressive disorder. She seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381–1383f.[1] Plaintiff has filed a brief in support of reversing or remanding the Commissioner's decision, and the Commissioner has responded. (Dkt. Nos. 15, 19.) Plaintiff contends that she is disabled because of the extreme pain caused by her rheumatoid arthritis and asks the Court to consider additional medical records as evidence. Because substantial evidence supports the denial of Plaintiff's application and because Plaintiff has not identified new material evidence that might have changed the Commissioner's decision, the Court affirms the Commissioner's decision.

---

[1] Kilolo Kijakazi has succeeded Andrew Saul as Acting Commissioner of the Social Security Administration and is therefore substituted as the named defendant. *See* Fed. R. Civ. P. 25(d).

**BACKGROUND**

In February 2013, Plaintiff filed two applications: one for disability insurance benefits (alleging an onset date of August 10, 2009) and one for supplemental security income (alleging an onset date of December 31, 2012). (Admin R. ("A.R.") 191–92, 194–200.) In those initial applications, Plaintiff listed several impairments that limited her ability to work, including hepatitis C, hyperthyroidism, rheumatoid arthritis, and depression. (*Id.* at 238.) She later amended her alleged onset date to April 21, 2014 because she worked as a part-time certified nursing assistant until April 20, 2014. (*Id.* at 39–40.) Plaintiff was insured under the Social Security Act through December 31, 2016. (*Id.* at 19.)

The Social Security Administration initially denied Plaintiff's application in August 2013 and denied the application again on reconsideration in March 2014. (*Id.* at 70–91, 94–123.) Plaintiff had a hearing before an ALJ on July 17, 2015. (*Id.* at 35–69.) In October 2015, the ALJ issued a written opinion concluding that Plaintiff was not disabled at the relevant time. (*Id.* at 17–28.) Plaintiff's request for review was denied by the Social Security Administration Appeals Council in February 2017. (*Id.* at 1–6.) Having exhausted her administrative appeals, Plaintiff filed the present complaint.

**I.     Plaintiff's Testimony**

The following facts are drawn from Plaintiff's testimony at the July 2015 administrative hearing. Plaintiff was 49 years old at the time of the hearing. (*Id.* at 40–41.) From May 2013 to April 2014, she worked as a certified nursing assistant at a nursing home. (*Id.* at 42.) At first, she worked full time, but she reduced her hours to part time—only eight to twenty-one hours per week—by February 2014. (*Id.* at 42–43.) Over time, she became slower and less able to lift certain residents, and needed help from other employees. (*Id.* at 43.) By April 2014, Plaintiff

2

could not stand on her feet for long periods of time—after twenty or thirty minutes, her back and knees would hurt and she would become unable to climb stairs. (*Id.* at 44.) She described the pain as a "seven or eight" on a scale of one to ten. (*Id.* at 45.) At the time of the hearing, Plaintiff reported that she could only walk two to four blocks without issue. (*Id.*) She also reported challenges with sitting—specifically, after thirty minutes sitting down, she would feel pinching or a spasm in her back, her hands might swell, and her elbows might go out. (*Id.* at 46.) Previously, Plaintiff also worked in medical billing, medical records, and data entry. (*Id.* at 59–60.) However, she testified that she could no longer perform that work because she could no longer type efficiently and because those jobs require employees to sit all day. (*Id.* at 61.)

Plaintiff explained that she had good days when she could wash clothes, make her bed, type, and engage in other tasks, and bad days when she could barely get out of bed and needed help to get off of the toilet. (*Id.* at 53.) She attributed those problems to two diagnoses: first, rheumatoid arthritis, and second, depression. (*Id.* at 56.) As an example of her current impairments, Plaintiff explained that she had recently accompanied her cousin on a car trip from Chicago to Atlanta, and then took a bus to return to Chicago. (*Id.* at 56–57.) During that trip, she said her cousin had to pull over often because of Plaintiff's impairments, causing the trip to take around thirteen hours instead of the usual ten hours, and that the bus trip was "a mess" because she needed to stand and walk up and down the bus aisle during the trip. (*Id.*)

    **II.**    **Medical Evidence**

The administrative record includes 450 pages of medical records from numerous providers. (*Id.* at 401–851.) The key records include (1) treatment records and an impairment questionnaire from Dr. Serafin Chua, Plaintiff's treating rheumatologist; (2) treatment records from Dr. Paula Butler, her treating endocrinologist; (3) treatment records and an impairment

questionnaire from Mark Stolspart, a nurse practitioner; and (4) treatment records from Dr. Viktoria Erhardt, who treated Plaintiff for depression.

In August 2013, Dr. Chua examined Plaintiff. He noted that "there are still days when [Plaintiff] is having a lot of joint pain" and assessed her as suffering from rheumatoid arthritis. (*Id.* at 756.) He next examined her in October 2013, when Plaintiff reported that the joint pain in her hands had gotten much better, although she had been suffering discomfort in her left elbow and back for the preceding week. (*Id.* at 753.) Dr. Chua prescribed additional medications to address Plaintiff's back spasms. (*Id.* at 754.) He next saw Plaintiff in April 2014, when Plaintiff reported additional joint pain and stiffness in her hands, back, and one of her knees. (*Id.* at 750.) He observed a slightly decreased range of motion in Plaintiff's shoulder, minimal tenderness in her elbows and wrists, and crepitations (rattling or crackling sounds) in both knees. (*Id.* at 751.) He noted that Plaintiff had not followed up in six months and advised her to follow up more frequently. (*Id.*) Dr. Chua saw Plaintiff again in May 2014, when he observed that her joint pain and achiness had improved, although she still complained of intermittent, mild discomfort in one of her knees, her back, and her hips. (*Id.* at 747.) He observed only minimal tenderness in Plaintiff's wrists and noted that her condition had improved. (*Id.* at 748.)

In July 2014, Dr. Chua completed a disability questionnaire in which he described Plaintiff's prognosis as "excellent." (*Id.* at 765.) He did not assess the extent of her pain, inflammation, and limitation of movement, instead referring to his notes (presumably, his treatment notes). (*Id.*) However, he ascribed no limitations to Plaintiff in grasping, turning, or twisting objects; in using fingers and hands for fine manipulation; and in using arms for reaching. (*Id.* at 766.) When asked to estimate Plaintiff's ability to sit or stand during a workday, he responded only, "N/A." (*Id.* at 769.) He responded the same way to the questionnaire's question

4

of how many pounds Plaintiff could lift or carry and what emotional factors (like depression and anxiety) affected her. (*Id.* at 770.) He concluded that Plaintiff's pain, fatigue, and other symptoms were only "seldom" severe enough to interfere with her attention and concentration, and that she was capable of "moderate" work stress. (*Id.* at 770–71.) However, he also concluded that Plaintiff would need to take breaks to rest or relieve pain at unpredictable intervals during an 8-hour workday, although he could not predict the frequency of those breaks. (*Id.* at 771.) He noted that her impairments were likely to produce "good days" and "bad days." (*Id.*) He also concluded that Plaintiff's impairments would only require her to be absent from work less than once a month. (*Id.*)

Dr. Butler also saw Plaintiff during this period. She concluded that the prognosis for Plaintiff's hyperthyroidism was good; for example, in October 2013, she noted that Plaintiff was euthyroid (her thyroid gland was functioning normally) and projected that over the next twelve-to-eighteen months her hyperthyroidism "may resolve on its own." (*Id.* at 635.) However, over a period of about eighteen months, Dr. Butler observed various symptoms relating to swelling, spasms, and pain. She observed that Plaintiff had swelling of her MCP joints (knuckles) in June 2013; pain in her back, left elbow, and fingers, and decreased range of motion in her left elbow and swollen fingers in August 2013; "arthritic changes in her fingers" in October 2013; joint swelling in February 2014; an increase in pain, including pain in wrists, fingers, knees, elbows, and back, and swollen fingers in May 2014; and tiredness, difficulty in moving, back spasms, pain in fingers, elbows, and knees, and swelling of MCP joints in January 2015.[2] (*Id.* at 635, 637–38, 641, 644, 647, 650.)

---

[2] The administrative record includes the first page of a disability impairment questionnaire completed by Dr. Butler; however, it does not include the rest of the questionnaire. (A.R. 34, 760.) Plaintiff does not appear to have supplemented the record to include the rest of the questionnaire.

5

Nurse Practitioner Mark Stolspart also treated Plaintiff during this time. During a May 2014 visit, Plaintiff reported to Stolspart that she had stopped working because her work as a certified nursing assistant was causing her too much pain. (*Id.* at 612.) Plaintiff elaborated that she was unable to lift patients due to pain, that pain and swelling in her hands had limited her ability to type or use a pen or pencil, and that her pain contributed to worsening depression. (*Id.*) She also reported that she had recently fallen twice while getting out of her car and that she had started using a cane. (*Id.*) Stolspart observed musculoskeletal tenderness, swelling and tenderness in Plaintiff's fingers, and back pain. (*Id.* at 615.) He provided a referral to physical therapy. (*Id.*)

Over time, Stolspart authored multiple opinions regarding Plaintiff's ability to work. In November 2013, Stolspart wrote a letter clearing Plaintiff to return to work performing light duty, although he noted that her rheumatoid arthritis and other conditions caused her significant pain. (*Id.* at 506.) Six months later, in May 2014, Stolspart wrote another letter stating that Plaintiff had difficulty standing, walking, and typing, and noting that she might not be able to work for up to one year due to her conditions. (*Id.* at 632.) In March 2015, Stolspart completed a disability impairment questionnaire, in which he concluded that Plaintiff could only perform a job in a seated or standing position for an hour or less per day. (*Id.* at 762.) He opined that Plaintiff would need to get up from a seated position to move around every hour and wait at least twenty minutes before returning to a seated position. (*Id.*) He also opined that Plaintiff could only occasionally lift 0–5 pounds during the workday, and never more than five pounds. (*Id.*) Stolspart further concluded that Plaintiff would need to take unscheduled breaks three or four times per day for at least twenty minutes each and that she had impairments in grasping, turning, and testing objects, using her hands and fingers for fine manipulations, and using her arms for reaching. (*Id.* at 763.) He also stated that Plaintiff would be absent from work more than three times per month because

6

of her impairments and that her depression contributed to the severity of her symptoms. (*Id.* at 764.)

Finally, Plaintiff completed an initial evaluation appointment on December 31, 2013 with Dr. Viktoria Erhardt, who diagnosed her with depressive disorder and ascribed moderate symptoms to her. (*Id.* at 781.) In a follow-up appointment the following month, Plaintiff was prescribed Lexapro, an antidepressant. (*Id.* at 782.) In subsequent visits, Plaintiff reported sluggish energy in February 2014, improved energy and sleep in March 2014, relative improvement but low energy in May 2014, good sleep and decreased depression but low energy in June 2014, increase in depressive symptoms and worsening condition but okay sleep and mood in September 2014, some depressive symptoms but overall improvement in March 2015, and "overall modest improvement" in June 2015. (*Id.* at 785, 788, 790, 793, 795, 797, 800.)

### III. The ALJ's Findings

On October 29, 2015, the ALJ issued a written decision finding that Plaintiff was not disabled between April 20, 2014 and the date of his decision. (*Id.* at 17–28.) The ALJ reached the following conclusions. Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016 and had not engaged in substantial gainful activity since the alleged onset date of her disability. (*Id.* at 19.) Plaintiff suffered the severe impairments of hyperthyroidism, rheumatoid arthritis, mild L4-5 spondylosis, mild knee arthritis, and depressive disorder pursuant to 20 C.F.R. §§ 404.1520(c), 416.920(c). (*Id.*) However, her impairments did not meet or medically equal the criteria of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 20.) The ALJ specifically considered Listings 1.02 (major joint dysfunction), 1.04 (back impairment), and 9.00 (endocrine disorders). (*Id.*) The ALJ also concluded that the severity of Plaintiff's mental impairments did not meet or approximate the criteria of Listing 12.04 (affective

7

disorders). (*Id.*) The ALJ found no restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence, and pace, and no episodes of decompensation of extended duration. (*Id.* at 20–21.)

The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work, with some exceptions. (*Id.* at 21.) Among other things, the ALJ found that Plaintiff could only occasionally stoop, crouch, crawl, kneel, or balance; could only occasionally climb ramps and stairs; could not constantly reach and handle; and could only perform simple work not involving public contact. (*Id.*)

The ALJ was not persuaded by Plaintiff's testimony regarding her limitations. He noted that through April 2014, Plaintiff drove 35 to 40 minutes from her residence to two nursing homes where she helped residents shower, dress, and participate in activities. (*Id.* at 22.) The ALJ also noted that Plaintiff had amended her disability onset date to April 21, 2014, which he viewed as a concession that Plaintiff could not sustain disability prior to that date. (*Id.* at 22, 39–40.) He observed that Plaintiff now reported extreme restrictions, including that she could not perform a sedentary job, that she needed a break after doing laundry for 30 to 45 minutes, that she could not open or twist a can or carry a pot of water, that she could not sit for more than thirty minutes without experiencing pain, and that her depression made it nearly impossible to get out of bed on "bad days." (*Id.* at 22.) The ALJ concluded that Plaintiff's testimony was not credible because of the work she performed immediately before her date of amended onset, which required significant functional capacity. (*Id.* at 23.)

The ALJ also took issue with perceived inconsistencies in Plaintiff's testimony. He observed that she had traveled to Atlanta by car with her cousin because her cousin wanted someone to travel with her and Plaintiff wanted to see Atlanta. (*Id.*) The ALJ concluded that if

8

Plaintiff really could not do sedentary work because she suffered pain every time she sat down for more than thirty minutes, then she would not have voluntarily undergone a long car trip for recreational purposes. (*Id.*)

The ALJ noted, and Plaintiff did not rebut, that Plaintiff's hyperthyroidism no longer caused impairments sufficient for a finding of disability. (*Id.*) Instead, Plaintiff's testimony and the ALJ's analysis focused on her rheumatoid arthritis. The ALJ reviewed treatment notes from Dr. Chua, which (among other things) demonstrated that Plaintiff's condition improved significantly when she took certain medications. (*Id.* at 24.) Further, numerous physical examinations of Plaintiff revealed normal walking and good range of motion, only slightly reduced grip, mild arthritis, and mild spondylosis. (*Id.*) The ALJ also considered medical records regarding Plaintiff's depression, which included periods of improving and worsening depression, but generally suggested only moderate symptoms. (*Id.* at 24–25.)

Next, the ALJ weighed medical opinions from various providers. He gave significant weight to Dr. Chua's impairment assessment, which concluded that Plaintiff's rheumatoid arthritis only caused moderate impairments. (*Id.* at 25.) But he gave only minimal weight to Stolspart's impairment questionnaire. The ALJ noted that Stolspart, as a nurse practitioner, was not a medically qualified source. (*Id.* at 26.) He found that the record was not consistent with the severe impairments that Stolspart described. (*Id.*) The ALJ also concluded that Stolspart's opinion was inconsistent with the light to medium exertion work that Plaintiff performed before the amended date of onset and that it was inconsistent with Dr. Chua's opinion. (*Id.*) Ultimately, the ALJ chose to credit Dr. Chua's opinion, noting that Dr. Chua was the treating physician responsible for addressing Plaintiff's rheumatoid arthritis and was familiar with Plaintiff's condition before and after she began treatment. (*Id.*) Finally, the ALJ stated that he gave "some weight" to the opinion

9

of state agency medical consultants who previously determined that Plaintiff was not disabled, although he differed from their opinion by concluding that Plaintiff did have a severe mental health impairment based on new evidence. (*Id.*) Otherwise, the ALJ did not discuss the state agency medical consultants' opinions in any detail or explain how he used their testimony.

In the end, the ALJ found that Plaintiff could not perform any of her past relevant work, including as a certified nurse assistant, medical records clerk, medical billing clerk, or data entry clerk, based on her RFC. (*Id.*) The ALJ then concluded that there were jobs in significant numbers in the national economy that Plaintiff could perform—for instance, as a production assembler—based on testimony from a vocational expert. (*Id.* at 26–27.) Because Plaintiff could make a successful adjustment to other work that existed in significant numbers in the national economy, the ALJ concluded that Plaintiff was not disabled. (*Id*. at 27.)

## DISCUSSION

The Court reviews the ALJ's disability determination to evaluate whether his stated rationales were supported by "substantial evidence." 42 U.S.C. § 405(g); *see Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). Substantial evidence requires "more than a mere scintilla" and is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). A reviewing court must conduct a "critical review" of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, it will not be affirmed if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The Court's review is deferential, but the ALJ must consider certain factors prescribed by regulation and cite evidence in the record in support of his credibility findings. *Shauger*, 675 F.3d

at 696. However, "even if reasonable minds could differ on the ALJ's rejection of [the claimant's] testimony, [the Court] will not reweigh evidence or substitute [its] judgment for the ALJ's." *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

To determine whether a claimant is disabled, the ALJ employs a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(4). The ALJ determines, in the following order: (1) whether the claimant is not currently engaged in substantial gainful activity; (2) whether the claimant has a severe medically determinable physical or mental impairment; (3) whether the impairment meets the criteria of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant's RFC renders her unable to perform her past relevant work; and (5) whether the claimant's RFC, age, education, and work experience make her unable to adjust to other work existing in significant numbers in the national economy. *Id.* "A negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two, or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability." *Young v. Sec'y of Health & Hum. Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

##### I.  Substantial Evidence & Legal Standard

Plaintiff, in her *pro se* Amended Complaint, asserts that the ALJ's decision was not supported by substantial evidence and applied an erroneous standard of law. She asserts in her brief that the pain she suffers from rheumatoid arthritis is so severe that she cannot work and that she has had to stop driving because of the pain in her knees, hands, and wrists. She also contends that she has sought multiple interventions to relieve the pain but they have been unsuccessful, and that she falls without warning because of her ailments.

Plaintiff has not pointed to specific deficiencies in the ALJ's analysis or reasoning or explained why his decision lacked substantial evidence. Plaintiff also has not offered any specific

support for her assertion that the ALJ applied an erroneous standard of law. But because Plaintiff is not represented by a lawyer, the Court gives her the benefit of the doubt. *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed." (internal quotation marks omitted)); *Austin v. U.S. Dep't of Educ.*, No. 08 CV 5559, 2010 WL 1172569, at *1 (N.D. Ill. Mar. 19, 2010) ("*Pro se* litigants are generally entitled to a level of deference not otherwise afforded to ordinary litigants represented by counsel."). Thus, the Court considers whether the record, on its face, reveals a lack of substantial evidence or failure to apply a legal standard correctly.

    Here, the ALJ's discussion of the record was thorough. He weighed the medical records and the opinion evidence and drew specific conclusions about the level of impairment that Plaintiff suffered. His conclusions are consistent with those records and medical opinions. Simply put, the treating provider with the greatest expertise and insight into Plaintiff's condition—her rheumatologist—opined that her prognosis was excellent and did not ascribe any limitations to her that were consistent with a finding of disability. Plaintiff has not pointed to a document in the record when the ALJ made his decision that suggests otherwise. And even though Stolspart had a different opinion about Plaintiff's limitations, the ALJ offered several good reasons for discounting his opinion, including its lack of consistency with Plaintiff's medical records and the opinion of her treating rheumatologist. The ALJ also applied the correct legal standard when he determined that Plaintiff was not disabled. He conducted the five-step analysis set out in 20 C.F.R. § 404.1520(a)(4) and presented a reasonably thorough discussion of those steps. The Court observed no plain legal error in the ALJ's discussion and Plaintiff has not suggested any specific deficiency.

Still, the ALJ's opinion does include some questionable assumptions about the nature of Plaintiff's disability. For example, the ALJ took issue with Plaintiff's trip to Atlanta, reasoning that a person who suffered as much pain as Plaintiff claimed would not undertake a long car trip for recreational purposes. But the bottom-line question in the disability analysis is whether a person is capable of working full time. *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013). A person who suffers too much pain to work full time might risk discomfort and even injury to pursue a meaningful project—like taking a trip with a cousin or traveling to a new city— especially if that person expected her condition to deteriorate. Likewise, the ALJ discounted Plaintiff's testimony in part because she enjoyed taking walks, visiting with her mother, playing with her grandchildren, and going to the movies. (A.R. 25.) But a person's ability to perform such activities—with or without significant pain—does not establish her ability to work full time. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (describing the failure to recognize differences between activities of daily living and requirements of full-time work as "a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases"). A person need not be entirely sheltered and incapacitated to be incapable of full-time work. Nevertheless, the "substantial evidence" standard requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The ALJ built a logical bridge from the evidence to his conclusion, reasonably crediting the opinion of Plaintiff's treating rheumatologist that Plaintiff did not suffer severe impairments. His opinion was supported by substantial evidence.

II.  **New Medical Evidence**

Plaintiff also asks the Court to consider additional medical records, attaching more than 1,000 pages of documents. She emphasizes a letter from Stolspart, her treating nurse practitioner,

dated November 17, 2017. (Pl.'s Br., Dkt. No. 15., at 4.) Stolspart writes that Plaintiff's rheumatoid arthritis causes her severe pain, which is unpredictable, never disappears, and makes it impossible to work. (*Id.*) He also writes that Plaintiff suffers from chronic back pain that has not responded to treatment and that she has proactively worked to manage and reduce her pain. (*Id.*) Other than this letter, Plaintiff has not cited or emphasized any particular document in her thousand-page evidentiary submission.

Construing Plaintiff's filing liberally, the Court understands Plaintiff to seek a remand to the ALJ to consider additional evidence. The Court may remand a case for consideration of new evidence "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).[3] "Materiality" is defined as "a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered," and "new" is defined as "evidence not in existence or available to the claimant at the time of the administrative proceeding." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997) (internal quotation marks omitted).

In his opinion, the ALJ discounted the opinion evidence from Stolspart because it contradicted the treating rheumatologist's opinion and was not consistent with Plaintiff's medical records. The ALJ's weighing of this evidence was reasonable and, as discussed above, his conclusion was supported by substantial evidence. Thus, it is hard to imagine that yet another opinion letter from Stolspart would have changed the ALJ's mind. The additional letter is neither new nor material and does not support remanding this case.

---

[3] The Commissioner contends that Plaintiff has waived this argument, *see Ehrhart v. Secretary of Health & Human Services*, 969 F.2d 534, 537 n.5 (7th Cir. 1992), but the Court construes Plaintiff's request to "consider additional medical records as evidence" as sufficiently expressing her interest in obtaining relief based on new evidence. (Am. Compl., Dkt. No. 11.)

14

The Court will not pore over the more than 1,000 additional pages of new medical records to scrutinize whether any page contains some material information that could have changed the ALJ's mind. Many of these records appear to reflect treatment that occurred after the ALJ's decision, and therefore could not have changed his mind, because he concluded only that Plaintiff was not disabled through the date of his decision, not afterward. And without a detailed index, it is difficult to determine which documents, if any, were previously presented to the ALJ. Ultimately, Plaintiff was responsible for explaining her argument based on the additional medical records but she has failed to do so. *See Hanrahan v. Thieret*, 933 F.2d 1328, 1335 n.13 (7th Cir. 1991) (Courts need not consider at length arguments raised only "in a very opaque manner" or without explanation).

## CONCLUSION

For the foregoing reasons, the Commissioner's decision denying Plaintiff's application for disability insurance benefits and supplemental security income is affirmed. The Clerk is directed to enter Judgment in favor of the Commissioner. Civil case terminated.

ENTERED:

Dated: July 26, 2021

Andrea R. Wood
United States District Judge